**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 13-4458

———————

COLUMBIA GAS TRANSMISSION, LLC,
                                        Appellant

v.

1.01 ACRES, MORE OR LESS IN PENN TOWNSHIP,
YORK COUNTY, PENNSYLVANIA, LOCATED ON
TAX ID# 440002800150000000 OWNED BY
DWAYNE P. BROWN AND ANN M. BROWN;
DWAYNE P. BROWN; ANN M. BROWN

———————

No. 13-4459

———————

COLUMBIA GAS TRANSMISSION, LLC,
                                        Appellant

v.

101 ACRES, AND 41,342 SQ. FT MORE OR LESS IN
HEIDELBERG TOWNSHIP,
YORK COUNTY, PENNSYLVANIA, LOCATED ON TAX
ID #30000EE1600000000, OWNED BY BRADLEY E.
HERR AND ELIZABETH M. HERR; BRADLEY E. HERR;
ELIZABETH M. HERR

---

No. 13-4460

---

COLUMBIA GAS TRANSMISSION, LLC,
                                        Appellant

v.

1.5561 ACRES, MORE OR LESS IN
HEIDELBERG TOWNSHIP,
YORK COUNTY PENNSYLVANIA, LOCATED ON TAX
ID #30000ED010300000000, OWNED BY MYRON A.
HERR AND MARY JO HERR;
MYRON A. HERR; MARY JO HERR

2

No. 13-4461

COLUMBIA GAS TRANSMISSION, LLC,

Appellant

v.

1.010 ACRES, MORE OR LESS IN PENN TOWNSHIP,
YORK COUNTY PENNSYLVANIA, LOCATED ON TAX
ID #440002800240000000, OWNED BY DOUGLAS W.
HILYARD AND TESSA J. HILYARD; DOUGLAS W.
HILYARD; TESSA J. HILYARD

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(Nos.:  4-13-cv-00778; 4-13-cv-00783;
4-13-cv-00785 and 4-13-cv-00786)
District Judge:  Honorable Matthew W. Brann

Argued on July 9, 2014

Before:  RENDELL, CHAGARES and JORDAN,
Circuit Judges

(Filed: September 26, 2014)

Anastasia P. Cordova, Esquire
Stephen P. Mulligan, Esquire
John D. Wilburn, Esquire   **(Argued)**
McGuire Woods
1750 Tysons Boulevard
Suite 1800
Tysons Corner, VA 22102

Erin N. Fischer, Esquire
McGuire Woods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222
                *Counsel for Appellant*

Joshua M. Autry, Esquire **(Argued)**
Michael F. Faherty, Esquire
Lavery Faherty Patterson
225 Market Street
Suite 304, P. O. Box 1245
Harrisburg, PA 17108
                *Counsel for Appellees*

---

O P I N I O N

---

**RENDELL**, <u>Circuit Judge</u>:

4

The issue before us is straightforward: does Columbia Gas Transmission, LLC ("Columbia"), have the right of eminent domain to obtain easements over the land of objecting landowners, outside of the existing right of way, in order to replace deteriorating pipeline? The answer is equally straightforward and clear: yes.

The regulatory authority given to natural gas companies such as Columbia actually anticipates replacement outside the existing right of way as we discuss below, and contains no adjacency requirement. The issue before us, then, whether Columbia has a right to replace the pipeline outside of the existing right of way, is actually a non-issue. But, the District Court put a peculiar "spin" on the regulations in question, finding them to be ambiguous by adopting its own definition of "replace" and concluding that a "notice" of "proposed rulemaking" for "Emergency Reconstruction of Interstate Natural Gas Facilities" promulgated by the Federal Energy Regulatory Commission ("FERC") after 9/11 should somehow be viewed as resolving this ambiguity in the law. Our dissenting colleague adopts this argument. However, we suggest that the statute and regulations are clear and the case before us is easily resolved.

Columbia, an interstate natural gas company subject to the jurisdiction of FERC, seeks to replace a portion of a natural gas pipeline ("Line 1655") that runs in and around York County, Pennsylvania. Because the original location of the pipeline has become heavily populated, the replacement will not track the original line but instead will be outside the

5

existing right of way. (App. 27.)[1] In an effort to obtain easements necessary to complete construction of the replacement, in March 2013, Columbia filed Complaints in Condemnation against four landowning couples (the "Landowners") in federal court. In May 2013, Columbia filed motions for partial summary judgment and for preliminary injunctions to acquire immediate possession of the easements. In June 2013, the Landowners also filed motions for summary judgment. The District Court subsequently denied Columbia's motions and granted the Landowners' motions, holding that Columbia did not have the right of eminent domain required to condemn the easements. The District Court's conclusion rested on the determination that the relevant FERC regulation, 18 C.F.R. § 157.202(b)(2)(i), was ambiguous. As a result, the Court looked outside the regulations to a sentence in a notice of proposed rulemaking that it concluded set forth the agency interpretation. This was a mistake. The language of the governing regulations could not be more clear. For the reasons set forth below, we will reverse the judgments of the District Court.[2]

---

[1] The District Court stated that the replacement pipeline would be one quarter of a mile from the original but the Landowners counter that the replacement pipeline will be "up to a mile away." (App. 15.) The actual distance between the replacement pipeline and the existing pipeline is not clear from the record, but because using the greater distance does not change our position with respect to the appeal, we will assume that it is correct.

[2] Columbia also appeals the judgment of the District Court with respect to a motion for reconsideration (or a "motion to alter") it filed on December 13, 2013. Because we will reverse the District Court on the motions for summary

## I. Background

Line 1655 is over fifty years old, and Columbia asserts that portions of the pipeline must be replaced to meet safety standards established by the Pipeline and Hazardous Materials Safety Administration. Columbia has already replaced 19,000 feet — or 95% — of the pipeline but has been stalled in replacing the last 1,000 feet because it lacks the remaining necessary easements — that is, the easements on and across the Landowners' properties. Columbia attempted to obtain these easements through negotiation, as it had the others it needed, but was unsuccessful.[3] Accordingly, Columbia filed a complaint in the District Court, seeking condemnation of the remaining easements to which it was entitled pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h). Before addressing the District Court's disposition of the case, we will set forth the statutory scheme that underpins Columbia's entitlement to the easements.

A. Statutory Scheme

The Natural Gas Act provides:

> When any holder of a certificate of public convenience and necessity cannot acquire by

---

judgment, the appeal of the order concerning the motion for reconsideration will be moot.

[3] The Dissent makes the claim that Columbia "threatened" the Landowners. (Dissent. Op. at 3.) This is a sensationalist reading of Columbia's statement that its offers were higher than the fair market value of the land, and has no basis in the record.

7

contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas . . . *it may acquire the same by the exercise of the right of eminent domain* in the district court of the United States for the district in which such property may be located, or in the State courts.

15 U.S.C. § 717f(h) (emphasis added). Accordingly, a certificate of public convenience and necessity gives its holder the ability to obtain automatically the necessary right of way through eminent domain, with the only open issue being the compensation the landowner defendant will receive in return for the easement. In 1983, FERC issued a blanket Certificate of Public Convenience and Necessity (the "FERC Certificate") to Columbia that covers Line 1655. Columbia's FERC Certificate states that Columbia is "authorized to conduct many *routine activities* and abandon facilities and service on a self-implementing basis *without further authorization by the Commission.*" (App. 104.) (emphasis added) In defining "routine activities," the Certificate references 18 C.F.R. § 157.203(b). This regulation provides that blanket certificate holders have *automatic authorization* to engage in transactions described in certain other provisions, including 18 C.F.R. § 157.208(a), which states, in relevant part:

If the project cost does not exceed the cost limitations set forth in column 1 of Table I, under paragraph (d) of this section, or if the project is required to restore service in an

8

> emergency, the certificate holder is authorized to make miscellaneous rearrangements of any facility, or acquire, construct, *replace*, or operate any *eligible facility*.

18 C.F.R. § 157.208(a) (emphasis added). Costs limitations are not an issue in this case.[4] Thus, if Columbia is replacing an "eligible facility," this constitutes a "routine activity" and Columbia can conduct this activity on a "self-implementing basis without further authorization by the Commission." (App. 104.)[5]

---

[4] As relevant here, gas companies holding a certificate, relying on Section 157, must provide notice to FERC and an environmental impact statement for any replacement construction project, unless the costs are less than $11 million. 18 C.F.R. § 157.208(a)-(b), (d). Columbia had originally budgeted the replacement for Line 1655 at $10.6 million, but encountered additional costs in the form of condemnation proceedings. (App. 1412-13.) Accordingly, Columbia requested a waiver of the $11 million cost cap from FERC. The agency concluded that: "[I]t appears that Columbia made a good faith effort to construct the replacement project under the guidelines and cost limits set forth in section 157.208(d) of the Commission's blanket certificate regulations. Based on the specific facts and circumstances of this project, waiver of cost limitations in this instance is granted." (App. 1413.)

[5] The Dissent urges that some notice or process should accompany this type of activity by certificate holders, in order to avoid constitutional problems. That argument is best made to Congress – or in the next case. It has not been raised in the case before us.

It is important to note that if Columbia Gas did not have a *blanket* certificate, and instead merely possessed a certificate of public convenience and necessity *authorizing construction* of a mainline, for instance, it would be able nonetheless to construct or extend facilities "which constitute the replacement of existing facilities that have or will soon become physically deteriorated or obsolete, to the extent that replacement is deemed advisable, if . . . [t]he replacement facilities . . . will be located in the *same* right-of-way or on the same site as the facilities being replaced . . . ." 18 C.F.R. § 2.55(b)(1); 15 U.S.C. § 717(f)(c)(1)(A). This provision is an exemption that relieves natural gas companies from the requirement of having to obtain a certificate of public convenience and necessity.

However, *with* the instant *blanket* certificate of public convenience and necessity, authorizing routine activities on a self-implementing basis, Columbia is not limited to replacing within the same right of way, pursuant to Section 2.55(b). Instead, as noted above, it can engage in any routine activity without further authorization including generally "replac[ing] . . . any eligible facility." 18 C.F.R. § 157.208(a). The issue becomes: is Columbia replacing an "eligible facility"? If so, it needs no further authorization.

Section 157.202(b)(2)(i) defines an "eligible facility" as including "*main line*, lateral, and compressor *replacements* that do not qualify under § 2.55(b) of this chapter because they will result in an incidental increase in the capacity of main line facilities, or because *they will not satisfy the location or work space requirements of § 2.55(b).*" Thus, by definition, this provision includes the replacement of facilities that cannot "be located in the same right-of-way or on the

10

same site as the facilities being replaced." 18 C.F.R. § 2.55(b)(ii). Accordingly, by their terms, Sections 157.203(b) and 157.208(a) specifically and automatically authorize the main line replacement at issue here as a routine activity in connection with an eligible facility that cannot be located in the same right of way or same site, which Columbia Gas has the right to "self-implement[]" without further authorization from FERC. (App. 104.)

Though not disputed here, even the right of blanket certificate holders to replace eligible facilities is not without limits. The Dissent points out four such checks: a reporting requirement, a notice requirement, an environmental-impact-statement requirement, and monetary restrictions. (Dissent Op. at 27.)

Other curbs significantly restrict the nature of replacement projects. Certificate holders may not construct new "delivery points" under the guise of replacement. 18 C.F.R. § 157.202(b)(2)(ii)(E). Also, in general, "Replacements for the primary purpose of creating additional main line capacity are not eligible facilities" under blanket certificate authority. *Id*. § 157.202(b)(2)(i). That is, "Replacements must be done for sound engineering purposes." *Id*. In clarifying this stricture, FERC "underscore[d]" that "there must be a physical need to replace facilities," such that gas companies may not circumvent the general requirements for new pipeline construction simply by designating it "replacement." *Revision Of Existing Regulations Under the Natural Gas Act*, 64 Fed. Reg. 54522, 54527 (Sept. 29, 1999) (codified at 18 C.F.R 157). FERC also encourages the enforcement of such regulations through the filing of complaints against companies that falsely claim

11

the need to replace pipelines. *Id.* Again, none of these limitations are at issue here; Appellees do not challenge, for instance, that Line 1655 is being replaced for sound engineering reasons. But the regulations ensure that gas companies do not possess unfettered discretion in constructing and siting replacement pipelines.

**B. The District Court's Opinions**

In October 2013, the District Court granted the Landowners' motions for summary judgment, holding that Columbia did not have the right of eminent domain. The Court reached this conclusion by turning to one dictionary definition of the word "replace," and using it to read an adjacency requirement into Part 157. In relevant part, the Court stated:

> Columbia Gas's contention . . . is that its certificate automatically authorizes relocation of replacement Line 1655 literally anywhere on earth, so long as the replacement "will not satisfy the location or work space requirements of § 2.55(b)." But this interpretation of the regulations puts an excessively expansive gloss on the common meaning of "replace," *see Webster's Third New International Dictionary, Unabridged*, s.v. "replace," accessed October 23, 2013, http://unabridged.merriam-webster.com ("1: to place again: restore to a former place, position, or condition"), a term that generally does not imply significant relocation. Moreover, Columbia Gas's interpretation is seemingly contrary to the

12

structure of the regulations, which equate the "relocation of existing facilities" with another defined term, "miscellaneous rearrangement," *see* 18 C.F.R. § 157.202(b)(6), not with "replacement[]," *see* 18 C.F.R. § 157.202(b)(2)(i). The meaning of "replacements that do not qualify under § 2.55(b)," is, at best, ambiguous as it relates to Columbia Gas's replacement Line 1655.

(App. 32-33.) Having created this ambiguity, the District Court turned to a notice of proposed rulemaking issued by FERC in 2003 in connection with emergency construction of natural gas pipelines after 9/11. The Court viewed the notice of proposed rulemaking as "a fairly definitive interpretation" of the replacement provision contained in Part 157. (App. 33.)

The notice was issued in order to "give pipeline companies greater flexibility to reconstruct pipelines during emergencies caused by 'deliberate effort[s] to disrupt the flow of natural gas.'" (App. 33 (citations omitted).) It states, in pertinent part:

> [P]art 157, Subpart F, permits replacement construction that uses temporary workspace beyond the bounds of the temporary workspace previously used to construct the original facilities as necessary to install replacement facilities. These regulations also permit locating a portion of mainline, lateral, or compressor replacement facilities *outside, but presumably adjacent to, an existing right-of-way* where, for whatever reason, the new facilities could not be

13

placed entirely within the original facilities' existing right-of-way. These regulations, however, do not appear to contemplate mainline construction over *an entirely different route* as may be necessary to circumvent the site of a disaster if immediate replacement is necessary before the original site is again available.

> *Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act*, 68 Fed. Reg. 4120, 4122 (proposed Jan. 17, 2003) (to be codified at 18 C.F.R. 157) (emphasis added).[6]

---

[6] The District Court also commented on other portions of the 2003 notice regarding Part 157:

> The agency repeated this general idea a number of times: "part 157 . . . does not permit the extensive deviation from an existing right-of-way that would presumably be necessary to circumvent a restricted or quarantined area," "[part 157] was broadened incrementally in 1999 to [allow] mainline replacements . . . that . . . did not lie within the original facilities' footprint, and consequently were outside of the section 2.55(b) replacement parameters . . . [but] this

The District Court read the Notice as imposing an "adjacency" requirement onto any replacement of a pipeline made under Part 157. The Court then also determined that since the replacement pipeline would be "approximately a quarter-mile distant" from the existing pipeline and thus, did not

modification in the breadth of eligible facilities did not contemplate the more extensive rerouting that would be required to reach around a cordoned accident area," "[the 1999 broadening of part 157] recognized the need to grant natural gas companies the flexibility to act under blanket certificate authority to replace facilities where construction of new facilities might spill over the original temporary workspace or permanent right-of-way . . . [but did not] envision[] replacement of facilities outside the existing right-of-way by the creation of an entirely new route due to the need to circumvent an accident site.

(App. 34-35 (citations omitted).)

15

align with its definition of "replace" that required the same location, it could not "be properly characterized as [a] 'replace[ment]' of an 'eligible facility.'" (App. 36.)

On November 22, 2013, however, FERC issued a Final Rule implementing changes to certain portions of Part 157 of Title 18 of the CFR, which governs the instant case.[7] The Final Rule included a footnote in which FERC identified a fact pattern essentially identical to the one at issue here — that is, whether a company can rely on its blanket certificate to replace the capacity of a segment of an obsolete pipeline with a new pipeline that may need to be located a considerable distance from the old pipeline. (*See* App. 1042.) In it, FERC specifically states that Part 157 allows for such replacement even where the replacement is not adjacent to an existing right of way:

> "[w]hile the Commission has indicated previously that it is *contemplated* that replacement facilities constructed under blanket authority *would usually* be located *adjacent* to, if not within, an existing right-of-way, *sections 157.202(b)(2)(1) and 157.210 permit the construction of non-*

---

[7] This Final Rule has nothing to do with the Notice of Proposed Rulemaking previously discussed that was referred to by the District Court.

16

*main line facilities and main line facilities, respectively, without restriction on their location.*"[8]

---

[8] In full, the footnote reads:

> We note that in instances where a pipeline company needs to rely on its Part 157 certificate to construct auxiliary or replacement facilities because they do not satisfy the location or work space limitations of section 2.55, the Part 157 blanket certificate regulations impose no limitations on the placement of the facilities. While the Commission has indicated previously that it is contemplated that replacement facilities constructed under blanket authority would usually be located adjacent to, if not within, an existing right-of-way, sections 157.202(b)(2)(1) and 157.210 permit the construction of non-main line facilities and main line facilities, respectively, without restriction on their location. For example, a company can rely on its Part 157 blanket certificate to replace the capacity of a segment of obsolete pipeline with new pipeline that may need to be located at considerable distance from the old pipeline in order to avoid a housing development constructed since the old pipeline was installed or to install auxiliary facilities such as anodes offset from the existing right-of-way to provide cathodic protection.

*Revisions to Auxiliary Installations, Replacement Facilities, and Siting and Maintenance Regulations*, 78 Fed. Reg. 72794, 72805 n.78 (Dec. 4, 2013) (to be codified at 18 C.F.R. §§ 157 & 380) (emphasis added). Effectively, FERC repudiated the District Court's interpretation of the regulation at issue.

On December 13, 2013, Columbia filed Rule 59(e) Motions to Alter the Judgment of the District Court based on FERC's recently issued Final Rule. On May 20, 2014, the District Court denied Columbia's Motions to Alter, holding that the footnote in FERC's Final Rule was not entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997) (holding that deference is owed to an agency's interpretation of its own ambiguous regulation). The District Court described FERC's Final Rule as an "about-face" (App. 54) and explained that under *Christopher v. SmithKline Beecham Corporation*, it was not entitled to deference because it

---

*Revisions to Auxiliary Installations, Replacement Facilities, and Siting and Maintenance Regulations*, 78 Fed. Reg. 72794, 72805 n.78 (Dec. 4, 2013) (to be codified at 18 C.F.R. §§ 157 & 380). The Dissent notes the promulgation of this Final Rule closely following the District Court's decision as if this is problematic. To the contrary, we view the Final Rule as FERC's specific, reasonable rebuttal to what it viewed as a total misreading of the regulations governing its operation. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (noting that "*Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief . . . .").

conflicted with FERC's prior interpretation of Part 157, as set forth in the Notice of Proposed Rulemaking, and therefore did "not reflect the fair and considered judgment of the agency." (App. 56); *see also Christopher*, 132 S. Ct. 2156, 2166 (2012) (*Auer* deference does not apply where "there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question," such as where "the agency's interpretation conflicts with a prior interpretation") (internal quotation marks omitted). Consequently, the District Court denied the motion and reaffirmed its prior opinion denying Columbia's right of eminent domain.

Columbia challenges the District Court's orders relating to the motions for summary judgment, the motions to alter, and the motions for preliminary injunctions. We address each matter in turn below.

## II. Discussion[9]

### A. The Motions for Summary Judgment

"Our review of the grant or denial of summary judgment is plenary, and we apply the same standard as the district court." *Mylan Inc. v. SmithKline Beecham Corp.*, 723

---

[9] The District Court had jurisdiction under 28 U.S.C. § 1331 and the Natural Gas Act, 15 U.S.C. § 717f(h). We have jurisdiction pursuant to 28 U.S.C. § 1291.

F.3d 413, 418 (3d Cir. 2013) (internal quotation marks omitted). Summary judgment is appropriate where "drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 322 n.2 (3d Cir. 2005) (internal quotation marks omitted). In reviewing cross-motions for summary judgment, we view the facts contained in each motion in the light most favorable to the nonmoving party. *Heffner v. Murphy*, 745 F.3d 56, 65 (3d Cir. 2014).

We will reverse the District Court's orders granting the Landowners' motions for summary judgment and denying Columbia's motions for partial summary judgment because the Court erred in reading an adjacency requirement into the provision regarding replacement pipelines in Part 157 of FERC's regulations. The regulations are unambiguous. Section 157.202(b)(2)(i) defines an "eligible facility" as including "main line, lateral, and compressor replacements that do not qualify under § 2.55(b) of this chapter because they will result in an incidental increase in the capacity of main line facilities, or because they will not satisfy the location or work space requirements of § 2.55(b)." Section 2.55(b) covers replacement facilities that "will be located in the same right of way or on the same site as the facilities being replaced, and will be constructed using the temporary work space used to construct the original facility." Therefore, a mainline replacement, as in the case of Line 1655, is an eligible facility under Part 157 and covered under Columbia's certificate, by definition, because it involves construction outside of the existing right of way.

The District Court erred in adopting its own definition of "replace" as meaning putting something back in the same place. The meaning of "replace," as commonly understood, is not so limited. One replaces electrical wiring in a house, for example, by removing worn out or obsolete wires and putting in new ones, even if the new wires are routed differently from the original wires. The District Court, and the Dissent, omit the most relevant definitions of the word "replace":

> 2: to take the place of : serve as a substitute or successor of : succeed, supplant  <the saw and sawmill rapidly *replaced* the ax . . .>
> . . .
> 4: to fill the place of : supply an equivalent for < a broken toy should not be immediately *replaced* . . .>

Webster's Third New International Dictionary 1925 (3d ed. 1993). Put simply, in common parlance, "replace" can mean to substitute for, or it can mean to literally re-place, to put back in the same position. Because the regulations here concern replacing old pipeline, i.e., substituting new for old, the former definition is the only appropriate one. That definition of replace, to provide an equivalent or substitute, contains no inherent adjacency requirement. Accordingly, the District Court's and the Dissent's, reading injects ambiguity into the regulation where none exists. The District Court should have ended its analysis by concluding that the regulations unambiguously permitted Columbia to complete the replacement of Line 1655 outside the existing right of way with its existing FERC certificate.

The District Court and our dissenting colleague would have a replacement not be a replacement, but rather a

21

"relocation" if constructed in a different place than the original pipeline. But how can this square with Section 157.202(b)(2)(i), which allows for "replacements" outside the existing right of way, so long as the gas company holds a blanket certificate of public convenience and necessity?

More importantly, however, the definition of "replace" put forward by the District Court, and now described as the "better reading" by our dissenting colleague, (Dissent Op. at 9), is simply incompatible with the statutory scheme and therefore not a reasonable interpretation of the word's meaning in this context. The Dissent agrees with the District Court in concluding that the word "replace" should be read in the regulation to mean, to "restore to a former place, position, or condition." (Dissent Op. at 8). Finding this definition to be favorable, the Dissent argues that "[t]he fact that there are at least two ways of understanding the word 'replacement' shows that it is ambiguous . . . ." (Dissent Op. at 11.) In fact there is no ambiguity because the definition proposed by the Dissent is inapplicable here for two reasons.

First, as noted above, using the definition of "replace" supplied by the Dissent would render portions of the statute nonsensical. Even the Dissent notes that, "sound principles of interpretation 'dictate that a regulatory scheme should be read as a whole, so that effect is given to all its provisions.'" (Dissent Op. at 7.). (quoting *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n*, 515 F.3d 247, 254 (3d Cir. 2008). In determining whether a statute is ambiguous, we:

> account for both the "specific context in which . . . language is used" and "the broader context of the

22

statute as a whole." A statutory "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."

*Utility Air Regulatory Group v. E.P.A.*, 134 S. Ct. 2427, 2442 (2014). If "replace" were limited to restoring to a former place or position, why would Section 2.55(b) specify that it applies only to replacements "located in the same right-of-way or on the same site as the facilities being replaced"? Similarly, Section 157.202(b)(2)(i) defines an "eligible facility," *inter alia*, as a replacement that "will not satisfy the location or work space requirements of § 2.55(b)," that is, a replacement that is situated outside the position of the previous pipeline. This conclusively proves that the plain meaning of replace in this context is *not* to restore to a former place or position.

If we were to apply the Dissent's suggested definition of the word "replace" to the regulation, the result would be absurd–a replacement could never occur under Part 157 in the situation contemplated. Where a replacement facility *cannot* be "located in the same right-of-way or on the same site as the facilities being replaced," 18 C.F.R. § 2.55(b), it clearly cannot take the former place or position of the replaced facility. Finally, the Dissent's definition would contravene Section 157.202(b)(ii)(B), which states that an "Eligible facility does not include . . . [a]n extension of a main line, except replacement facilities covered under § 157.202(b)(2)(i)." Thus, far from requiring replacements to take the place of the old pipeline, the regulations explicitly

23

recognize that replacement pipelines may properly result in extensions of a main line.[10]

Second, a clear understanding of the definition adopted by the District Court and the Dissent shows its inapplicability to the statutory context here. To "restore" an object to a "former place," (Dissent Op. at 8) necessarily implies that the object previously occupied a certain position, and that same object is being returned to that position. Another way to understand this definition is by considering "replace" to mean literally "re-place," whereby an object is removed, possibly modified, and returned to its original location. For instance: "after dusting the vase, she replaced it on the shelf" [11]; "[r]eplace your boots on your bare feet, and paddle across waterway with well-protected feet"[12]; "replaced the card in the file."[13]

---

[10] Perhaps recognizing these points, the Dissent argues that it is not claiming that the pipeline must be replaced in "exactly the same spot." (Dissent Op. at 9.) This contradicts its chosen definition, however. One cannot both claim that replace means to restore to the same place or position, *and* that it means to install in a different place or position. And once one acknowledges that a replacement, i.e. substitute, might well occupy a different location from the thing it has replaced, as we well agree, there is no inherent limit in the word "replace" as to where a replacement may be situated.

[11] *Replace*, Cambridge Dictionaries Online, http://dictionary.cambridge.org/us/dictionary/ american-english/replace (last visited September 12, 2014).

[12] *Replace*, Oxford English Dictionary, http://www.oed.com/view/Entry/162819?rskey=

In other words, an object is placed back in its former location.[14] One cannot place back something which never was placed in that position to begin with. Thus, the Dissent's definition necessarily allows Columbia only to place the same pipeline back again in its former location. Accordingly if Columbia installed a new pipeline as part of a replacement project, even in the original right of way, it would automatically be in violation of the certificate, because it would not be "replacing" a pipeline back to its original site, i.e., it would not be "restoring" any pipe to its "former" position. Thus, the definition favored by the District Court and Dissent is so stringent as to be absurd and cannot govern here.[15]

The District Court also erred in relying on FERC's post-9/11 notice of proposed rulemaking, as requiring that

---

BbM3iQ&result=2&isAdvanced=false (last visited September 12, 2014)).

[13] Webster's Third New International Dictionary 1925 (3rd ed. 1993).

[14] While the Dissent accuses us of "cherry-pick[ing]" these examples, we cite them simply as representative uses of the word "replace" when used in the sense of restoring to a former place. (Dissent Op. at 9 n.6.) If there is another way of employing the word in this context, we have not encountered it and the Dissent does not supply it.

[15] Instead, "replace" in the broad sense of "to furnish an equivalent or substitute" controls "especially" in the case when referring to something that "has been lost, depleted, worn out, or discharged . . . ." American Heritage Dictionary of the English Language 1479 (4th ed. 2009).

25

replacements must be adjacent to replaced pipelines. This notice concerned the previously unaddressed situation of the restoration of gas service in the aftermath of a disaster. A close examination of the language of the notice makes manifest the error of relying on it as imposing or confirming an "adjacency" requirement in the law. For example, it states that replacement facilities contemplated under Part 157 would be "outside, but *presumably* adjacent to, an existing right of way." *Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act*, 68 Fed. Reg. at 4122 (emphasis added). There is nothing controversial or new in this statement. A replacement pipeline would "presumably" be adjacent to an existing pipeline for a number of practical reasons – cost, environmental permitting limitations, capacity requirements, and convenience. This does not mean, however, that a replacement pipeline is *required* to be adjacent to an existing right of way. The other sentence noted by the Dissent is similarly inconclusive: "[t]hese regulations, however, do not appear to contemplate mainline construction over an *entirely different route* as may be necessary to circumvent the site of a disaster . . . ." *Id.* (emphasis added). Again this is dicta, but even more it states the obvious: regulations that speak to replacing "physically deteriorated or obsolete" pipeline indeed might not be viewed as "contemplating" completely changing the location of a totally obliterated pipeline to circumvent a disaster.[16] Nowhere does

---

[16] The notice dealt specifically with emergencies such as a "sudden unanticipated loss of natural gas or capacity," not deteriorating pipelines. 68 Fed. Reg. at 4120. Presumably FERC wanted to make clear that whether existing lines were rendered inoperable or were totally destroyed due to a disaster, re-routing was permissible. One cannot fault FERC

the Notice of Proposed Rulemaking state that replacement pipelines, in a non-emergency context, must be located adjacent to the original right of way.[17]

---

for wanting to cover all bases in such a situation, lest someone contend that "replacement" in the existing regulations applied only to the routine replacement of pipelines that "have or will soon become physically deteriorated or obsolete . . . ." 18 C.F.R. § 2.55(b)(1).

[17] Indeed, FERC did not impose an adjacency requirement in adopting that portion of Section 157.202(b)(2)(i) which allows replacement construction outside the original right of way. In the relevant Final Rule, several comments had "argue[d] that replacements not in the same ROW [right of way] should be covered under the blanket certificate instead of requiring a separate §7(c) application." *Revision of Existing Regulations Governing the Filing of Applications for the Construction and Operation of Facilities To Provide Service or To Abandon Facilities or Service Under Section 7 of the Natural Gas Act*, 64 Fed. Reg. 26572, 26580 (May 14, 1999) (codified at 18 CFR 157). Accordingly, one such comment proposed the clause that was subsequently codified, allowing construction outside the previous right of way. FERC thus agreed with the comments, stating broadly that: "We intend to allow replacement facilities that do not qualify under §2.55(b) because of land requirements to be eligible facilities that can be constructed under §157.208 of the blanket certificate. Further, to the extent that pipelines require more ROW than is provided for in appendix A to part 2 for replacement projects, including those not in the original footprint, such as river crossings, etc., those replacements would qualify as eligible facilities under our proposal." *Id.* The only caveats noted by FERC were that such replacements

The Notice of Proposed Rulemaking, in any event, is entirely consistent with the plain text of the regulations, authorizing replacements by certificate-holders outside the right of way without any explicit adjacency requirement. Indeed, the Final Rule established that FERC views its regulation the same way. Accordingly, we need not even consider principles of deference where the regulation is unambiguous. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.") The regulation speaks for itself, such that Columbia is entitled to the easements necessary to complete the replacement of Line 1655. The District Court erred in concluding otherwise.

For its part, the Dissent contends that (1) the regulations are ambiguous because of the different possible meanings of "replace", (2) the Notice of Proposed Rulemaking is "plainly in opposition" to the Final Rule, and (3) therefore the Final Rule is not entitled to *Auer* deference. (Dissent Op. at 20); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (noting that *Auer* deference may not be appropriate where an "agency's interpretation conflicts with a prior interpretation . . . .") Even putting aside the fact that the meaning of "replace" is unambiguous, as noted above, the caveats, vague language, and highly specific nature of the situation dealt with in the Notice of Proposed Rulemaking establish that there is no conflict with the Final Rule. Further, the Final Rule itself recognizes, and perfectly harmonizes with, the language of the previous Notice: "[w]hile the Commission has indicated

were subject to environmental restrictions and landowner notice provisions.

previously that it is contemplated that replacement facilities constructed under blanket authority would *usually* be located adjacent to, if not within, an existing right of way, sections 157.202(b)(2)(1) and 157.210 permit the construction of non-main line facilities and main line facilities, respectively, without restriction on their location." 78 Fed. Reg. at 72805 n.78 (emphasis added).

Even if we were to assume that the regulations are ambiguous, the interpretation of the Final Rule would still control. That is because the Final Rule is fully consistent with the Notice, and, as an agency interpretation of its own regulation, it is deserving of deference. *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) ("It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail. When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent with the regulation.") (internal quotations omitted). Thus, even if we accepted the Dissent's purported ambiguity in the regulations, FERC's interpretation in the Final Rule should control, and Columbia would remain entitled to the sought easements.

The Dissent also claims that the Final Rule is simply a "post hoc rationalization" on the part of FERC, and therefore not deserving of *Auer* deference. (Dissent Op. at 17.) We acknowledge that *Auer* deference may not be appropriate where an interpretation constitutes a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend *past agency action* against attack." *Christopher*, 132 S. Ct. at 2166 (emphasis added). But in this case, there is no past agency action that FERC is seeking to defend. Columbia

29

simply replaced its pipeline under its blanket certificate outside the original right of way, and FERC later made clear in the Final Rule that Columbia had the authority under the applicable regulations to do so. FERC is not a party to this action, nor does it have any reason to favor Columbia's interpretation over the Landowners', but, we submit, only desires to make clear what the regulations provide. The Final Rule accordingly should not be read as any type of post-hoc rationalization.

In the end, the Dissent's reading appears to be aimed primarily at avoiding what it perceives to be constitutional problems, namely "a grant of limitless authority." (Dissent Op. at 32.) As set forth above, blanket certificate-holders do not possess unfettered discretion to replace pipeline. They are constrained by cost limitations, here waived by FERC because of Columbia's good faith attempts at compliance, as well as notice requirements and environmental impact.[18] Further, replacements may not be installed simply because a company wishes to increase a pipeline's capacity. Rather, such projects may only be undertaken for "sound engineering purposes." 18 C.F.R. § 157.202(b)(2)(i). Appellees do not claim that the replacement project was undertaken for anything other than "sound engineering purposes." Further, even if constitutional issues might be implicated in a facial challenge, that would be an issue for another case, but that is not this case. We note that this constitutional argument was

---

[18]And, Columbia would appear to be constrained in replacing outside the existing right of way by the extra costs of doing so, including costs of negotiation and or litigation with landowners.

30

never raised by Appellees, has not been briefed, and therefore is not properly before us.

Lastly, the Landowners argue that the "miscellaneous rearrangement" provision of Part 157 limits Columbia's ability to replace the pipeline. This is incorrect. "Miscellaneous rearrangement" is defined, in part, as "any rearrangement of a facility, excluding underground storage injection/withdrawal wells, that does not result in any change of service rendered by means of the facilities involved, including changes in existing field operations or relocation of existing facilities." 18 C.F.R. § 157.202(b)(6). The Landowners claim that such a relocation may only take place "[o]n the same property." *Id.* § 157.202(b)(6)(i). As the District Court noted, however, Section 157.202(b)(6) lists the "three characteristics of 'miscellaneous rearrangements' *in the disjunctive.*" (App. 37.) Thus a relocation may take place on the same property, *or* it could occur, inter alia, "[w]hen required by . . . encroachment of residential, commercial, or industrial areas." *Id.* § 157.202(b)(6)(ii).

But this is beside the point. The fact that the "miscellaneous rearrangement" provision contemplates a scenario in which a pipeline must be "*relocated*" due to encroaching residential developments actually only goes to show that this is referring to a relocation, and not a replacement. Thus, "relocation," as used here, involves moving an existing entity to a new location, whereas "replacement" would involve a substitution of new for old. Accordingly, Section 157.208(a) treats "miscellaneous rearrangements" as something different from "replacements" of eligible facilities. Here, Columbia does not seek to move the existing pipeline to a new location. Rather, Columbia will

31

construct a new facility to serve in place of the deteriorating one. Thus, as Columbia argues, it is replacing Line 1655, not relocating it.[19]

Under the plain language of FERC's regulations, Columbia is automatically authorized to replace Line 1655 according to its proposed plan. Pursuant to its FERC Certificate, Columbia has the right of eminent domain over the easements that it seeks from the Landowners. Accordingly, we will reverse the orders of the District Court granting the Landowners' motions for summary judgment and denying Columbia's motions for partial summary judgment.[20]

### B. Motions for Immediate Possession

Columbia argues that we should grant it immediate possession of the easements by entering preliminary injunctions. It urges that further delay will be harmful to it and the public. If it is not able to begin replacement of Line 1655 until the determination of just compensation, the timely completion of the project will be jeopardized. The District

---

[19] The Landowners, in their brief, argued that Columbia seeks an "extension" of its pipeline requiring it to acquire a new certificate authorizing the project, pursuant to 15 U.S.C. § 717f(c)(1)(A). (Landowners' Br. at 11.) At oral argument, however, the Landowners conceded that Columbia does not seek an extension of its pipeline. We therefore do not address this argument.

[20] Having determined that the District Court erred in its disposition of the motions for summary judgment, we will dismiss the appeal of the Court's judgment on the motions to alter as moot.

Court's ruling that Columbia had not established the right to condemn the necessary easements obviously doomed Columbia's request. Given our ruling that recognizes Columbia's right of eminent domain, the issue of the preliminary injunction is properly before us. We believe that we can easily decide this issue in the first instance, such that remand, with its attendant delay, is unnecessary. This is not a "normal" preliminary injunction, where the merits await another day. In those situations, the probability of success is not a certainty such that weighing the other factors is paramount. Here, there is no remaining merits issue; we have *ruled* that Columbia has the right to the easements by eminent domain. The only issue is the amount of compensation— which will definitely be determined on remand, but the result of which can have no affect on Columbia's rights to the easements. That Columbia's entitlement to relief comes in the form of injunctive relief should not dictate that we impose similar constraints on our grant of that relief in this context. Nonetheless for the sake of completeness and because the District Court and Dissent seek to limit Columbia's entitlement we will examine the other factors. We believe they weigh in favor of granting the preliminary injunctions to which Columbia is entitled.

In determining whether a party is entitled to a preliminary injunction, we normally consider four factors: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest." *Am. Express Travel*

33

*Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (internal quotation marks omitted).

Having already determined that Columbia has succeeded on the merits, we now examine whether Columbia will suffer irreparable injury if it is denied relief. Columbia explains that pipeline construction season is relatively short and late to begin — the weather from November through February generally makes construction impractical and expensive.[21] Columbia states that if construction on the properties does not begin by *now* (actually September 1, 2014), weather events could have a significant disruptive effect and potentially delay the replacement of the pipeline until 2015. Columbia explains that there are safety concerns associated with an aging, unreliable pipeline, and that delay in possession of the easements will likely cause it to miss the in-service deadline in time for the beginning of the heating season on November 1, 2014. If Columbia misses the in-service deadline, it will lose the right to seek reimbursement from its customers. Thus the harm to Columbia appears to involve its safety, reputation, and economic interests.

Columbia points to the Fourth Circuit's opinion in *East Tennessee Natural Gas Company v. Sage*, 361 F.3d 808

---

[21] Columbia has submitted two affidavits in support of its motions for immediate possession–the affidavit of Doug Holley (former Manager of Asset Management for Columbia Gas and current Vice President of Projects for Contract Land Staff, which was hired by Columbia Gas to assist it in acquiring the easements for Line 1655) and the affidavit of Jacob Frederick (Manager of Project Management for Columbia Gas).

(4th Cir. 2004), in arguing that a preliminary injunction is warranted where a delay in construction of a pipeline would cause "significant financial harm" to both a gas company and its customers. *Id.* at 828-29. The Fourth Circuit explained that East Tennessee Natural Gas Company would be forced to breach certain contractual obligations if it were forced to delay construction in order to hold hearings on just compensation. *Id.* The Landowners argue that *Sage* is inapposite because Columbia has not shown that it will lose more than $5 million (which was the estimated loss in *Sage*). The Landowners also point to Third Circuit precedent stating that "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement," except where "the potential economic loss is so great as to threaten the existence of the movant's business." *Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (internal quotation marks omitted). Although Columbia has not cited a specific dollar amount for the financial harm it faces were we to deny relief, the harm alleged is not one of "purely economic injury." Here, there are also safety and potential liability concerns caused by an inability to meet the heating deadline.

Moreover, the harm to the Landowners that will result if we grant Columbia's preliminary injunctions is minimal. Since we have already determined that Columbia has the right of eminent domain, it is a certainty that the requested easements will be granted. The Fifth Amendment also guarantees that the Landowners will be justly compensated. The Landowners have not stated any concrete injury other than the loss of the easements over their land, which will definitely occur, whether or not we grant Columbia immediate possession of the easements.

35

Finally, we examine the public interest involved in Columbia's obtaining relief – it is this factor that overwhelmingly weighs in favor of granting Columbia's preliminary injunctions. The Landowners state, summarily, that "while the public does have an interest in the pipeline being replaced for safety reasons, an additional delay in replacement of Line 1655 will not result in any substantial harm to the public." Landowners' Br. 35. Columbia has explained, however, that the safety risks associated with a delay in the replacement work and acquisition of the easements will increase daily. In his affidavit, Jacob Frederick elaborated upon the safety risks: "the Pipeline may fail, collapse, explode, or leak, causing bodily and property injury or death and/or leaving the residents of York County without gas service." (Frederick Aff. 3.) In addition to these safety concerns, Columbia has made it clear that the residents of York County could possibly be without heat the entire winter if construction of the replacement does not begin soon.

Weighing all of the relevant factors, we conclude that Columbia is entitled to injunctive relief and therefore will be granted immediate possession of the easements.

## III. Conclusion

In sum, we will reverse the orders of the District Court (1) granting the Landowners' motions for summary judgment, and (2) denying Columbia's motions for partial summary judgment and for preliminary injunctions. We will dismiss the appeal of the order concerning the motions to alter as moot. Finally, we will remand to the District Court to enter the preliminary injunctions and conduct further proceedings.

JORDAN, *Circuit Judge*, dissenting

The Majority interprets the pertinent regulations to unambiguously allow private gas companies to replace a pipeline anywhere, on anybody's property, without any type of formal administrative review.  In deciding that the Federal Energy Regulatory Commission ("FERC") has extended such a broad grant of the sovereign power of eminent domain to private companies, the Majority relies on a definition of "replacement" not provided in the text of the regulations but supplied by Columbia, even though it is at odds with what Columbia admits is the common understanding of what constitutes a "replacement" and despite the fact that FERC had never adopted that definition until, in the middle of an unrelated rulemaking, the agency crafted a footnote in reaction to the District Court's decision in this case.  In my view, the Majority's limitless reading of the regulations is deeply problematic and renders them constitutionally suspect.  To avoid logical difficulties within the regulations, as well as to avoid constitutional concerns, some sort of locational limitation must serve as a constraint on pipeline replacement outside of an original right-of-way.

I agree with the District Court that the regulations are ambiguous and therefore resort to FERC interpretations is in order.  But FERC has been inconsistent in its explanations of the regulations, and the agency's most recent interpretation does not warrant deference.  FERC's previous interpretation, before it issued its footnoted reaction, reasonably indicated that there is indeed a locational limitation on pipeline replacements outside of an original right-of-way.  Because the pipeline project at issue here does not adhere to any locational limitation at all, it is not a "replacement" within the meaning

of that term in the regulations. As a consequence, Columbia should be required to petition FERC for a new certificate of public convenience and necessity before being permitted to condemn easements on property previously unaffected by Columbia's pipeline. I therefore respectfully dissent.

## I.    Background

On January 7, 1983, Columbia obtained a blanket certificate of public convenience and necessity (the "Certificate") that authorized the company to construct and operate a natural gas pipeline, known as "Line 1655," at the location specified in the application. The Certificate continues to authorize the company to engage in limited, routine activities with regard to that main-line facility, as expressly identified in FERC regulations. But, "[f]or other categories of activities, which may potentially require more scrutiny and opportunity for public participation," the Certificate calls for the company to submit to further regulatory procedures. (App. at 104 (footnote omitted).) Columbia now seeks to use its decades-old Certificate to construct a "replacement" pipeline "up to a mile away" from the original Line 1655 and on the lawns of the homes of Dwayne and Ann Brown, Bradley and Elizabeth Herr, Myron and Mary Jo Herr, and Douglas and Tessa Hilyard (collectively, the "Landowners"). (Appellee's Br. at 7.)

Columbia attempted at first to negotiate easements across the Landowners' properties but was refused. It warned the Landowners that the offers it had made "do[] not represent Columbia's view of the impact of the project on the fair market value [of the properties]. To the contrary, Columbia believes that the impact on fair market value will

2

be much less … ."  (App. at 277, 301, 342, 379.)  If the Landowners declined Columbia's initial offers, it threatened, "Columbia w[ould] pursue the alternate acquisition process provided to natural gas companies by the Natural Gas Act." (App. at 278, 302, 343, 380.)  In other words, interpreting its thirty-year-old Certificate to be a blank check for land condemnation, Columbia negotiated with an implicit threat: take our offers now or forfeit your property rights later, for considerably less money, in a condemnation proceeding.[1] After the Landowners maintained their rejection of Columbia's offers, the company sought to make good on that threat by filing the eminent domain suit now on appeal.

The District Court granted the Landowners' motions for summary judgment on the question of Columbia's asserted right to the easements.  In denying Columbia's motion for partial summary judgment on the same issue, the District Court held that "the project is not automatically authorized as a 'replace[ment]' of an 'eligible facility' pursuant to 18 C.F.R. §§ 157.202(b)(2)(i) & 157.208(a)." (App. at 35.)  Columbia petitioned to alter or amend the judgment, which was denied.  The Court observed that "[Columbia]'s attack does not point to an actual error in reasoning behind the Court's judgment.  Instead, Columbia

---

[1] The Majority labels this a "sensationalist reading of Columbia's statement" that "has no basis in the record." (Maj. Op. at 7 n.3)  I will leave it to the readers of our competing opinions in this case to determine who may be indulging in the more extravagant language.  Suffice it to say here that, in the language quoted above, there is a basis for the observation that Columbia negotiated with the threat of condemning the easements for less than the earlier offers.

3

… asserts that the Court should wholly defer to an agency interpretation that – according to precedent that Columbia … ignores – is properly due very little deference, if any beyond its power to persuade." (App. at 56.) The Court's reference to "an agency interpretation" is to FERC's "about-face" (App. at 54), discussed below, on whether a locational limitation restricts where a "replacement" pipeline can be put.

## II.     Discussion

Until recently, Columbia would not have been able to construct pipeline on a new route, as they are attempting to do in the proposed Line 1655 project, without seeking a new certificate of public convenience and necessity associated with the new right-of-way. At least not according to FERC. In 2003, that agency issued a notice entitled *Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act*, 68 Fed. Reg. 4120, 4122 (proposed Jan. 17, 2003) (to be codified at 18 C.F.R. pt. 157) (hereinafter *Emergency Reconstruction Notice* or *Notice*),[2] in which it discussed at length its then-current interpretation of the regulations now in question, particularly Title 18, Part 157 of the Code of Federal Regulations, which governs "eligible facilities," 18 C.F.R. § 157.202, .208. An eligible facility is a natural-gas installation, such as a pipeline, eligible for alteration, such as replacement, under the original certificate

---

[2] Ultimately, FERC promulgated a Final Rule based on the Emergency Reconstruction Notice. Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act, 68 Fed. Reg. 31,596 (May 18, 2003) (to be codified at 17 C.F.R. pt. 157) (hereinafter *Emergency Reconstruction Final Rule*).

4

granted for the development of that facility. 18 C.F.R. § 157.202(b)(2).[3] FERC apparently saw a shortcoming in the regulations, namely that they do not allow companies to effectively respond to an emergency that might require a pipeline to be moved or new pipeline to be installed on a route that varies significantly from the right-of-way contemplated in an already-issued certificate. *Id.* at 4120-24. For example, in the Emergency Reconstruction Notice, FERC indicates that § 2.55 of the regulations,[4] which governs replacement projects within an authorized right-of-way, is insufficient to address an emergency situation because it does not allow for construction "outside the footprint of existing facilities." *Id.* at 4123.

The Notice also says that "[P]art 157 . . . provides [a] vehicle for reconstruction of facilities … but this authority is … limited." *Id.* at 4121. It goes on to explain that, "[a]cting

---

[3] Section 157.202(b)(2)(i) provides, in relevant part, that "eligible facility includes main line, lateral, and compressor replacements that do not qualify under § 2.55(b) of this chapter because they … will not satisfy the location or work space requirements of § 2.55(b)." 18 C.F.R. § 157.202(b)(2)(i).

[4] Section 2.55(b)(1) excludes from the definition of facilities the construction of which requires obtaining a new certificate those projects "which constitute the replacement of existing facilities that have or will soon become physically deteriorated or obsolete, to the extent that replacement is deemed advisable, if … [t]he replacement facilities … will be located in the same right-of-way or on the same site as the facilities being replaced." 18 C.F.R. § 2.55(b)(1)(ii).

under blanket authority, [*i.e.*, the authority under Part 157 conferred by a certificate,] a pipeline may install new facilities on a new right-of-way, which may be acquired through the pipeline's exercise of eminent domain." *Id.* That authority "permit[s] locating a portion of mainline … replacement facilities outside, *but presumably adjacent to*, an existing right-of-way … ." *Id.* at 4122 (emphasis added). FERC further recognized this locational limitation on Part 157 authority by saying that "[t]hese regulations … do not appear to contemplate mainline construction over an *entirely different route* as may be necessary to circumvent the site of a disaster if immediate replacement is necessary before the original site is again available." *Id.* (emphasis added).

I understand that language to mean, as the District Court did, that Part 157 authorizes "replacements" that may involve placing a pipeline some minimal distance from its original right-of-way but that such a project must indeed involve only a very limited deviation from that route. The Majority, at Columbia's urging, sees the matter quite differently. As Columbia put it in argument before the District Court, when it comes to replacements, "[u]nder 157 there is no location restriction. There is no proximity restriction." (App. at 776.)

What there is, in short, is an ambiguity in the use of the word "replacement" in the regulations. *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) (stating that a regulatory provision is ambiguous "where the disputed language is reasonably susceptible of different interpretations" (citation and internal quotation marks omitted)). Despite the Majority's assertion to the contrary, the meaning of that term is not clear, and we are left to

6

dispute whether a pipeline "replacement" outside of an original right-of-way includes a locational limitation or is instead a concept without physical limits. That ambiguity is the first of two related problems in this case. The second is that the alternative interpretations of the ambiguous regulation are not equally innocuous. The one advocated by Columbia and adopted by the Majority raises internal inconsistencies and constitutional issues that can and ought to be avoided. I discuss both of those problems in turn.

### A. Ambiguity & Deference

### 1. Ambiguity

The Majority concludes that the regulations are unambiguous primarily by relying on the interplay between the right-of-way locational limitation in § 2.55(b) and the lack of an express locational limitation in the definition of "eligible facility" in § 157.202(b)(2)(i). For two reasons, I disagree with the conclusion my colleagues draw from that difference. First, sound principles of interpretation "dictate that a regulatory scheme should be read as a whole, so that effect is given to all its provisions." *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n*, 515 F.3d 247, 254 (3d Cir. 2008) (internal quotation marks omitted). As described in more detail herein, the Majority's approach fails to do that: it conflates "replacement" and "relocation," even though each has a specific and unique meaning in the regulations. Also, by interpreting the term "replacement" so broadly, it undermines § 2.55(b) because it leaves practically no limitation for replacement projects outside of an existing right-of-way. Further, it allows gas companies to circumvent the important notice and hearing requirements of §§ 157.6

7

and 157.10, which necessitate providing notice to both directly and indirectly affected property owners and an opportunity to participate in a regulatory hearing regarding certificate petitions.[5]

Second, the phrase "replacements that do not qualify under § 2.55(b) … because they … will not satisfy the location or work space requirements of § 2.55(b)," 18 C.F.R. § 157.202(b)(2)(i), is ambiguous because Part 157's use of "replacement" is reasonably susceptible to at least two different interpretations. The District Court, relying on the dictionary, defined "replace" as "to place again: restore to a former place, position, or condition," which, as the Court noted, suggests either no relocation or an insignificant relocation. (App. at 32.) The Majority, however, disagrees with that definition and says that, "[p]ut simply, in common parlance, 'replace' can mean to substitute for." (Maj. Op. at 21.) That is one reading of "replace." But, although my colleagues think their selected definition is the only applicable one, another and better reading in this context,

---

[5] In this same vein, the Majority claims that a significant check on a natural gas company's power to condemn easements under Part 157 for pipeline replacements is that the company must have within its possession a blanket certificate. But FERC's statement that "[a]lmost all interstate gas pipelines now hold [P]art 157 blanket certificates that permit the automatic construction … of certain 'eligible facilities'" suggests that the Majority's distinction is in effect no distinction at all. *Emergency Reconstruction Final Rule*, 68 Fed. Reg. at 31,598.

8

which involves locational issues, is the one chosen by the District Court.[6]

The Majority's preferred reading of "replace" leads it to declare that applying a location-focused definition of the term is "absurd." (*Id.* at 24.) It asserts that the position taken by the District Court and that I am advocating requires the replacement pipeline to be in exactly the same spot as the original. That is not so, and ordinary speech is not so rigid, as one of the Majority's own examples indicates: "after dusting the vase, she replaced it on the shelf." (*Id.* at 25 (internal quotation marks omitted).) When the vase makes it back onto the shelf, it has been replaced there, whether it is an inch or two to the left or right of where it had been. The location for the replacement is not a matter of pinpoint accuracy, but there is a limit. No one would describe the action as "replacing" the vase if it were put in another room. The Majority's certitude cannot mask the fundamental problem with its view. If the only requirement for a replacement is that it "substititut[es] new for old" (Maj. Op. at 21, 32), then a gas company may now replace pipeline originally located in York, Pennsylvania, anywhere in the United States, from

---

[6] The Majority also claims that I would require Columbia to use the same pipe in its construction efforts for those efforts to be categorized as a "replacement." (Maj. Op. at 25-26.) The Majority cherry-picks examples from the dictionary and improperly treats the characteristics of those suggestions as limitations on the term "replace." Nothing in what the District Court said or what I am saying has anything at all to do with the materials that may be chosen for a replacement project. This case is about where pipes are going into the ground, not which pipes are being used.

Portland to Poughkeepsie, as long as that original pipeline is somehow "old" and the replacement pipeline is somehow "new." Whatever the interpretation of "replace," that hardly seems the correct one, let alone the only plausible one. As the District Court said, that reading "puts an excessively expansive gloss on the common meaning of" the word. (App. at 32.) At the very least, "replacement" is ambiguous in this context, and so is the regulatory provision of which that term is a part.

Columbia tries to avoid that conclusion by asserting that the term "replacement" "has a specific meaning under the Code of Federal Regulations" (Appellant's Opening Br. at 24) that is "entirely different … than in everyday parlance" (Appellant's Reply Br. at 7). In other words, Columbia acknowledges that its proposed definition of replacement is not the only or even the most common interpretation. One might expect that, since Columbia and the Majority are rejecting "everyday parlance," their very different understanding of the word "replacement" would be rooted in some clear language in the Code of Federal Regulations delineating a specialized meaning. *Cf. Rowland v. Cal. Men's Colony*, 506 U.S. 194, 200 (1993) ("[C]ourts would hardly need direction where Congress had thought to include an express, specialized definition for the purpose of a particular Act … ."). But it is not. The specialized, non-customary definition they rely on is nowhere to be found in the regulations themselves; nor is it in any agency interpretation pre-dating the District Court's decision. Instead, in deciding that the word is unambiguous, the Majority relies on Columbia's favored definition, which the Majority says is dictated by "clear understanding." (Maj. Op. at 24.) Despite Columbia's admission about "everyday parlance"

10

(Appellant's Reply Br. at 7), and despite the Majority's own admission that "'replace' can mean to substitute for, *or* it can mean … to put back in the same position" (Maj. Op. at 21 (emphasis added)), the Majority proclaims that the "only appropriate" definition is the one "contain[ing] no inherent adjacency requirement." (*Id. at* 21-22.) If assertion were argument, that might be more persuasive, but declaring that something is unambiguous does not make it so.

Fortunately, we do not, in this administrative-law setting, need to choose between different dictionary definitions. The fact that there are at least two ways of understanding the word "replacement" shows that it is ambiguous, which requires us to consider how FERC has interpreted the word. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous."). That effort raises its own choices.

## 2. *Deference*

As noted earlier, FERC looked at the issue of replacement when it considered the Emergency Reconstruction Notice. Although the Notice is just that – a notice of proposed rulemaking – it answered the question of whether an additional limiting principle is necessary for replacements outside of a right-of-way authorized in a FERC-granted certificate. FERC published the Notice for the very reason that there was no authority under Part 157 to replace a pipeline in a location other than an existing right-of-way or "outside, but presumably adjacent to, an existing right-of-way," even in an emergency. *Emergency Reconstruction Notice*, 68 Fed. Reg. at 4122. FERC itself acknowledged the

11

locational limitation on pipeline replacement, saying the regulation "do[es] not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster." *Id.*

For a decade that was the last word on the matter, but one should never underestimate the continuing malleability of words. Despite FERC's well-grounded and plainly stated insight about the locational limitations in Part 157, the agency made a 180-degree turn one week after the District Court issued its opinion in this case and decided that mainline construction really is a free-form exercise after all. In a rule published on November 22, 2013, *Revisions to Auxiliary Installations, Replacement Facilities, and Siting and Maintenance Regulations*, 78 Fed. Reg. 72794, 72804 n.78 (Dec. 4, 2013) (to be codified at 18 C.F.R. pts. 2, 157, 380) (hereinafter *Revisions to Auxiliary Installations*), FERC inserted a footnote designed to "[e]ffectively[] … repudiate[] the District Court's interpretation of the regulation at issue" (Maj. Op. at 18). In that footnote, number 78 to be precise, FERC gave what amounts to an on-the-fly approval of the Line 1655 project by stating that "the Part 157 blanket certificate regulations impose no limitations on the placement of the facilities." *Revisions to Auxiliary Installations*, 78 Fed. Reg. at 72804 f.78. This new "Footnote Rule," as I will refer to it for convenience, is directly contrary to the interpretation provided in the Emergency Reconstruction Notice. *Id.* The question then arises: which FERC interpretation should be heeded?

A choice has to be made because an agency's interpretations of its own ambiguous regulations are, under Supreme Court precedent, entitled a degree of deference. The

12

direction given in *Auer v. Robbins*, 519 U.S. 452 (1997), is that the agency's interpretation is controlling unless it is "plainly erroneous or inconsistent with the regulation."[7] *Id.* at 461 (internal quotation marks omitted).   Nevertheless, in *Christopher v. SmithKline Beecham Corp.*, the Court recently cautioned that "this general rule [of deference] does not apply in all cases."  132 S. Ct. 2156, 2166 (2012); *see also* Harry T. Edwards et al., *Federal Standards of Review*, ch. XIV ("[T]he deference afforded an agency's interpretation of its own regulations is significant, but it is not without limits."). *Christopher* teaches that, once a regulation has been determined to be ambiguous, two questions should be considered in deciding whether an agency's new interpretation of the ambiguous provision is entitled to *Auer* deference: (1) whether the new interpretation is "plainly erroneous or inconsistent with the regulation," and (2)

---

[7] It bears mentioning that at least three Supreme Court justices have indicated an interest in revisiting the holding in *Auer*.   In *Decker v. Northwestern Environmental Defense Center*, 133 S. Ct. 1326 (2013), Chief Justice Roberts, joined by Justice Alito, concurred in applying deference to an agency interpretation, but explained that, even though it would have been improper to reconsider *Auer* in that case because the parties did not properly preserve the issue in their briefs, the Court should be prepared to do so in a subsequent case.  *Id.* at 1338 (Roberts, C.J., concurring).  Justice Scalia, in dissent, noted his discontent with what *Auer* has become: "For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of 'defer[ring] to an agency's interpretation of its own regulations.'"  *Id.* at 1339 (Scalia, J., dissenting).

whether the interpretation "reflect[s] the agency's fair and considered judgment on the matter in question." *Christopher*, 132 S. Ct. at 2166 (internal quotation marks omitted). An interpretation does not reflect fair and considered judgment if, for example, it "conflicts with a prior interpretation," or is "nothing more than a convenient litigating position," or is "a *post hoc* rationalizatio[n] advanced by an agency seeking to defend past agency action against attack," or if deference "would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Id.* at 2166-67 (alterations in original) (citations and internal quotation marks omitted).

*Christopher* also expressed a concern that agencies may take improper advantage of the deference extended to them under *Auer*: "Our practice of deferring to an agency's interpretation of its own ambiguous regulations undoubtedly has important advantages, but this practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'" *Id.* at 2168 (alteration in original) (footnote omitted) (quoting *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring)).

If a court finds that either the "plainly erroneous" or "fair and considered judgment" factor cuts against the agency's interpretation, that interpretation is reviewed not under *Auer*, but rather under the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See, e.g.*, *Christopher*, 132 S. Ct. at 2168-69 (turning to the *Skidmore* standard after concluding that "whatever the general merits of

*Auer* deference, it is unwarranted here"). Under *Skidmore*, deference is "proper only if the [agency's view] has the power to persuade, which 'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 n.4 (2013) (second and third alterations in original). In short, *Skidmore* deference is "a lesser degree of deference" than is given under *Auer* because it considers the interpretation as having at most the power to persuade, not the power to control. *Hagans v. Commn'r of Soc. Sec.*, 694 F.3d 287, 294-95 (2012).[8]

With that guidance in mind, I turn to the Emergency Reconstruction Notice and the Footnote Rule. The interpretation in the Notice acknowledges a much-needed constraint on how far a replacement project can stray from an original right-of-way. The Notice instructs that Part 157 does not authorize a pipeline replacement that proceeds on an entirely new route or is beyond what may fairly be characterized as being on or "adjacent" to the original right-of-way. If the proposed replacement pipeline does not fall within those limitations, the gas company must approach FERC for a new certificate. Nothing about the Notice

---

[8] The requirement to consider under *Skidmore* an agency interpretation that has failed the test for *Auer* deference shows just how deeply embedded the idea of deference to agencies has become. If an agency interpretation has already been determined to be "plainly erroneous" or something less than the product of "fair and considered judgment," it would seem very unlikely to have the power to persuade, but the *Skidmore* base must nonetheless be touched.

indicates that the interpretation it provides is plainly erroneous or fails to reflect FERC's fair and considered judgment. It would seem, then, to be guidance of the kind suited for *Auer* deference.

My colleagues, however, endeavor to downplay the importance of the Notice. They read its statement that Part 157 "permit[s] locating a portion of mainline[] … replacement facilities outside, but presumably adjacent to, an existing right-of-way," *Emergency Reconstruction Notice*, 68 Fed. Reg. at 4122, as meaning that, while practical considerations will generally prompt gas companies to build on the same or an adjacent route, those utilities need not do so. The word that the Majority uses to turn language of limitation upside down is "presumably." But such heavy reliance on that word to undo the express limitation in the Notice is misplaced. In the very next sentence of the Notice, FERC made clear that the regulations "do not appear to contemplate mainline construction over an entirely different route." *Id.* The Notice thus states and restates the necessary principle that should be guiding our instruction to Columbia today: if you want to take someone else's property for your pipeline, stay near your right-of-way and do not construct along a new route; otherwise, come back for a new certificate.

The Majority deems the advice in the Emergency Reconstruction Notice to be irrelevant because it "dealt specifically with emergencies such as a 'sudden unanticipated loss of natural gas or capacity,' not deteriorating pipelines." (Maj. Op. at 27 n.16.) Although it is true that the Notice advocated adoption of certain new regulations focused on how to better deal with emergency situations, that does not mean that the interpretation it provides of the existing

16

regulations in Part 157 is of no consequence. The interpretation provided in the Notice is very relevant indeed, being, as it is, a FERC statement about the meaning of Part 157 that can rightly be called "just and considered." It gives guidance on what Part 157 authorizes and what its restrictions are, without limiting those restrictions to emergency situations. *See Emergency Reconstruction Notice*, 68 Fed. Reg. at 4122 ("[P]art 157, subpart F, permits replacement construction that uses temporary workspace beyond the bounds of the temporary workspace previously used to construct the original facilities as necessary to install replacement facilities. *These regulations* also permit locating a portion of mainline, lateral, or compressor replacement facilities outside, but presumably adjacent to, an existing right-of-way where, for whatever reason, the new facilities could not be placed entirely within the original facilities' existing right-of-way." (emphasis added)). The interpretation advanced in the Notice is therefore generally applicable here.

The Footnote Rule, by contrast, is a textbook example of an agency shooting from the hip rather than giving a question fair and considered judgment. Despite the Majority's comments to the contrary, FERC's creation of footnote 78 one week after the District Court's opinion shows it to be a hastily arrived-at decision, devoid of the hallmarks of an agency interpretation deserving deference. The timing reveals the Footnote Rule as a post hoc rationalization meant to defend a past action, in this case Columbia's attempt to obtain property outside of the right-of-way allowed in its Certificate. *Cf. Christopher*, 132 S. Ct. at 2166 (noting that regulatory changes reflecting post hoc rationalization do not receive *Auer* deference). Moreover, the insertion of the new

17

interpretation in a footnote in the middle of an unrelated rule[9] about auxiliary facilities emphasizes FERC's eagerness to get it out as rapidly as possible, with the aim of undoing the District Court's decision. Again, that serves to highlight the interpretation as a post hoc rationalization of Columbia's asserted condemnation power. *Cf. Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991) (declining to defer to "'*post hoc* rationalizations' … advanced for the first time in the reviewing court").[10]

---

[9] Given that footnote 78 has nothing to do with the subject of the *Revisions to Auxiliary Installations* – which is auxiliary facilities, *see Revisions to Auxiliary Installations*, 78 Fed. Reg. at 72795 (explaining that the purpose of promulgating the revisions is "to clarify" regulations governing "auxiliary installations added to existing or proposed interstate transmission facilities") – it is ironic that the Majority endeavors to dismiss as mere dicta FERC's comments in the Emergency Reconstruction Notice. Those comments had the merit of being pertinent to the subject of the Notice.

[10] Columbia rightly points out that the Supreme Court has deferred to after-the-fact interpretations before, particularly in an amicus brief filed after the case had reached that Court. *See Decker v. Nw. Envt'l Def. Ctr.*, 133 S. Ct. 1326, 1337-38 (2013). But the Supreme Court in *Decker* looked past the post hoc nature of that brief primarily because "[t]he agency [in question] has been *consistent* in its view that the types of discharges at issue here do not require … permits." *Id.* Here, however, the Footnote Rule contradicts the Emergency Reconstruction Notice's prior interpretation of Part 157.

The Majority endeavors to pass off the new interpretation in the Footnote Rule as "perfectly harmoni[ous]" with what was previously said in the Emergency Reconstruction Notice (Maj. Op. at 29), but that ignores the warning in the Notice that Part 157 does "not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster if immediate replacement is necessary before the original site is again available," *Emergency Reconstruction Notice*, 68 Fed. Reg. at 4122. Because FERC opined that Part 157 does not allow new routing for a "replacement" pipeline

The Majority also says that FERC is not "'seeking to defend *past agency action* against attack'" and thus the Footnote Rule cannot be read as a post hoc rationalization. (Maj. Op. at 30 (quoting *Christopher*, 132 S. Ct. at 2166).) But FERC is absolutely justifying its failure to require Columbia to obtain a new certificate of merit for proposed Line 1655. Moreover, even if there were no agency decision to defend, the analysis is not so limited. Both the *Auer* and *Decker* Courts permitted relevant federal agencies to submit after-the-fact interpretations in amicus briefs in support of *another* agency's application of their regulations and not their own actions. *See Decker*, 133 S. Ct. at 1337-38 (EPA defending state decision-maker's determination); *Auer*, 519 U.S. at 461 (Secretary of Labor defending members of the St. Louis Board of Police Commissioners). Despite that difference, the Supreme Court went on to consider whether those interpretations were post hoc rationalizations. *Decker*, 133 S. Ct. at 1337-38; *Auer*, 519 U.S. at 461. In this case, one could interpret FERC to be likewise defending another's interpretation of its rules; the fact that the interpreter is a private company is of no moment.

19

even in the event of an emergency, there is precious little logic and no consistency in saying that new routing is permitted in the absence of an emergency. It is thus not harmonious to assert, as the Footnote Rule does, that "Part 157 … regulations impose no limitations on the placement of [replacement] facilities." *Revisions to Auxiliary Installations*, 78 Fed. Reg. at 72804 n.78. FERC at first interpreted Part 157 to include a geographic limitation on replacement projects. The Footnote Rule, issued with no notice and within a week of the judicial action to which it was a reaction, purports to completely do away with that limitation. The two interpretations are plainly in opposition.

FERC itself tacitly admits as much in footnote 78. It says, "[w]hile the Commission has indicated previously that it is contemplated that replacement facilities constructed under blanket authority[, *i.e.*, pursuant to a FERC-granted certificate,] would usually be located adjacent to, if not within, an existing right-of-way, [Part 157] permit[s] the construction of non-main line facilities and main line facilities[] … without restriction on their location." *Id.* No one, not even those in the Majority, can claim that what FERC was doing in that passage was saying how consistent its newly announced position is with its past statements. The evident purpose in giving a nod to what was said previously was to acknowledge but minimize the change in position. The while-we-previously-said locution hangs a bell on the difference.

That does not alter my colleagues' approach, though. They look to the use of the word "usually" – a replacement will usually be adjacent to or within an existing right-of-way – and they conclude that it must mean FERC never really laid

20

down an interpretation that restricts the location of a replacement pipeline. (*See* Maj. Op. at 29.) Like the word "presumably" in the Notice, however, the word "usually" in the Footnote Rule cannot carry the analytical weight the Majority puts on it. Rather than showing there is no rule, "usually" and "presumably" are words indicating that there is in actuality a standard way of proceeding – a rule, so to speak – one to which occasional exceptions may be found but a rule nonetheless. A statement that repudiates what had been the rule cannot rightly be labeled as being in harmony with the rule.

There is yet another reason to reject footnote 78 as the product of fair and considered judgment. In *Christopher*, the Supreme Court noted that, "where[] …. an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." 132 S. Ct. at 2168. Here, FERC issued the Footnote Rule in November 2013, over a decade after it published the Emergency Construction Notice. Anyone paying attention would certainly be surprised to find that what had been, by the agency's own interpretation, a presumptive limitation on where a pipeline could be replaced was suddenly no limitation at all. Deference to the Footnote Rule under such circumstances serves to foster cynicism and to subvert the purpose of formal rulemaking.[11]

---

[11] In addition to not being the product of fair and considered judgment, the Footnote Rule is plainly erroneous because the interpretation renders the relevant regulations internally inconsistent and constitutionally infirm, as I will discuss further hereafter.

21

FERC's new interpretation of Part 157 thus ought not receive the benefit of *Auer* deference, and it is no more salvageable under *Skidmore*. Footnote 78 is unpersuasive for all of the points already discussed. *Cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (noting an agency's "explanations lack the persuasive force that is a necessary precondition to deference under *Skidmore*"). It fails to persuade on another ground as well: it is inconsistent with Part 157 itself. If I understand the Majority correctly, Columbia's project can be considered as both a relocation and a replacement. That at least appears to be what Columbia believes, as shown in comments before the District Court. At a single hearing, it referred to the proposed Line 1655 construction interchangeably as a "replacement" and a "relocation." (*Compare* App. at 770 ("The pipeline itself is an eight inch gas main. The gas main is going to be relocated."), *and* App. at 787 ("We are not rerouting. We are relocating … ."), *with* App. at 775 ("We have the right to construct a replacement main that would not qualify under a 2.55 analysis.").)

The words "replacement" and "relocation" are not intrinsically incompatible as synonyms. Part 157, though, treats them differently, as denoting separate methods of authorizing pipeline construction, with different requirements applicable to each. When we examine a statute, "[w]e generally seek to respect Congress' decision to use different terms to describe different categories of people or things." *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1708 (2013). Our approach in reviewing a regulation should be the same. Part 157 defines authorized "replacement" projects as follows: "[E]ligible facility includes main line, lateral, and compressor *replacements* that do not qualify under § 2.55(b)

[governing work within a certificate-designated right-of-way] … because they will … not satisfy the location or work space requirements of § 2.55(b)." 18 C.F.R. § 157.202(b)(2)(i) (emphasis added). As for a "relocation" project, the regulation couches it not as a replacement but as a "miscellaneous rearrangement," saying, "[m]iscellaneous rearrangement of any facility means any rearrangement of a facility … including changes in existing field operations or *relocation* of existing facilities … ." *Id.* § 157.202(b)(6) (emphasis added). Because "replacement" and "relocation" are intended to mean different things in Part 157, an interpretation that allows the concept of the former to absorb the latter is dubious, but that is what the Majority's interpretation does. As noted by the District Court and as mentioned above, the definition of "replace" advocated by Columbia – and now adopted by the Majority – "puts an excessively expansive gloss on the common meaning" of that word (App. at 32), and thereby improperly allows Columbia to "replace" pipeline by constructing new pipeline a mile (or, for that matter, any distance) from the original right-of-way. When a replacement pipeline can go anywhere, there is no need to consider it for "relocation," and the separate provision for relocation is thus made of no effect.

In sum, the Footnote Rule is entitled to neither *Auer* nor *Skidmore* deference, and the interpretation in the Emergency Reconstruction Notice remains the best guidance. The District Court did not err in deciding that, because the Line 1655 project is neither within nor adjacent to the existing right-of-way,[12] the project is not a "replacement"

---

[12] The District Court noted that this case "does not rise and fall based on the definition of adjacency" because it is not

under Part 157, *Emergency Reconstruction Notice*, 68 Fed. Reg. at 4122, and thus cannot proceed without an additional certificate of public convenience and necessity.

### B. Constitutional Concerns[13]

An additional reason to adopt the Emergency Reconstruction Notice's interpretation of Part 157 is that the Majority's interpretation would render the regulations constitutionally infirm. The Majority's broader interpretation of "replacement" inappropriately grants to a private company eminent domain power coextensive with that of the state and strips future aggrieved landowners of their rights to formal

a close call whether the new route for Line 1655 is adjacent – the proposed route is "entirely new." (App. at 53 n.1.)

[13] The Majority notes that no constitutional arguments were raised in this case. That may be so, yet "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). We are attempting to understand the meaning of the regulation in question, and I am merely applying the canon of constitutional avoidance. That canon "is not a method of adjudicating constitutional questions"; rather, it "is a tool for choosing between competing plausible interpretations of a statutory [or, in this case, a regulatory] text." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The aim is to avoid constitutional problems, and we are not bound by the parties' arguments in determining which interpretive tools are relevant and how they bear on the proper construction of governing law.

24

administrative procedures. An essential canon of construction is that, if a court is faced with two possible interpretations of a regulation, "by one of which [the regulation] would be unconstitutional and by the other valid, [the court's] plain duty is to adopt that which will save the [regulation]." *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 226 n.8 (3d Cir. 2013) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937)) (internal quotation marks omitted). The more limited interpretation of "replacement" provided by the Emergency Reconstruction Notice should accordingly be applied to preserve §§ 157.202 and 157.208 as they relate to main-line replacements of eligible facilities.

The Supreme Court has recognized that there are tighter bounds on the exercise of eminent domain by a utility company than there are on that power when wielded by the sovereign. In *United States v. Carmack*, the Court held that "[a] distinction exists … in the case of statutes which grant to others, such as public utilities, a right to exercise the power of eminent domain on behalf of themselves. These are, in their very nature, *grants of limited powers*." 329 U.S. 230, 243 n.13 (1946) (emphasis added); *see also Nat'l R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1264-65 (2d Cir. 1987) ("Amtrak has not been authorized to exercise the sovereign's power of eminent domain. It has been granted a limited power, within the meaning of *United States v. Carmack,* to condemn land 'required [for] intercity rail passenger service.'" (alteration in original) (citations omitted)). That conclusion makes sense: when the power of eminent domain is partially delegated to a private company, that delegation must be as limited as possible to protect landowners from abusive takings under the Fifth Amendment.

25

The Majority seems to suggest that a private company's self-interest is a satisfactory limitation on the scope of the delegated power to take other people's property. (*See* Maj. Op. at 26 ("A replacement pipeline would 'presumably' be adjacent to an existing pipeline for … practical reasons – cost … and convenience."); *id.* at 30-31 n.18 ("Columbia would appear to be constrained in replacing outside the existing right of way by the extra costs of doing so, including costs of negotiation and or litigation with landowners.").) I am a great believer in the power of self-interest, but it does not serve as a constitutional check. We do not allow the government to condemn people's land without layers of procedural protection in place, and we certainly cannot allow a private company to do so simply on the assurance that it has reasons to exercise restraint. Yet an unsupervised condemnation power is exactly what Columbia claims to have under Part 157. When asked by the District Court if the interpretation Columbia was proposing meant that, in pursuing the Line 1655 "replacement" project, the company "could construct this line in, say, Lincoln, Nebraska," Columbia's counsel responded, "On a theoretical level you could." (App. at 776.) Counsel then outlined "practically" why that would not happen (*id.*), but that, as I will explain, amounts to cold comfort. "Trust me" is not a reassuring response to the question, "What will you do with the sovereign's power?"

Although Columbia contends that there are no locational limitations on replacing a main line under Part 157, it points to four things that it says, and the Majority agrees, should mollify concerns about giving to a utility the full condemnation power of the sovereign without the structural and procedural checks that limit the government. Those four

26

things are monetary restrictions, a notice requirement, an environmental-impact-statement requirement, and a reporting requirement. In this case, none of them function as a meaningful restraint.

It is true that a "replacement" pipeline can be built with less FERC supervision if its cost is below a monetary threshold. In 2013, the year Columbia began work on Line 1655, that threshold was $11,000,000, and staying below it meant that a gas company could avoid providing any formal notice or environmental-impact statement to FERC before identifying the land on which it planned to build. 18 CFR § 157.208(a)-(b), (d). Columbia at first projected that its costs would be below $11,000,000, so the notice and environmental-impact-statement requirements were made inapplicable here. The reporting requirement, meanwhile, is merely an annual "check-in" with FERC in which a gas company provides some information for each facility scheduled for completion that year. 18 C.F.R. § 157.208(e).[14] Therefore, other than the locational limitation now at issue, the cost cap was to be the lone constraint on Columbia's construction plans.

But, in this case, FERC actually waived even the $11,000,000 cost cap, thus removing the last restraint on the

---

[14] That information includes a "description of the facilities," a listing of the "specific purpose, location, and beginning and completion date of construction of the facilities installed," the "actual installed cost," and descriptions of consultations made regarding various environmental regulations. 18 C.F.R. § 157.208(e)(1)-(4).

company's exercise of eminent domain.[15]  With that restriction removed, § 157.208 swallows § 2.55(b), for if a natural gas company seeks to move its pipeline outside the original right-of-way and thus outside of § 2.55(b)'s purview, there is really nothing to prevent it from doing so.

The Majority proffers other "curbs" on replacement projects, in addition to its misplaced faith in its own perception of a gas company's self-interest. (Maj. Op. at 11.) Those include a requirement that the "'primary purpose'" of replacements be for sound engineering purposes – in other words, that "'there must be a physical need to replace facilities'" and that gas companies may not circumvent pipeline requirements merely by designating a project as a "'replacement.'"  (Maj. Op. at 11-12 (quoting 18 C.F.R. § 157.202(b)(2)(i); *Revision of Existing Regulations Under the Natural Gas Act*, 64 Fed. Reg. 54522, 54527 (Sept. 29, 1999) (codified at 18 C.F.R. part 157)).)  My colleagues also say that gas companies may not construct new delivery points or replace pipeline for the primary purpose of increasing main

---

[15] The fact that Columbia conveniently obtained the waiver in the middle of the proceedings below suggests that FERC did not engage in any substantial deliberation before issuing it.  What is more, FERC's proffered justification for the waiver was that the landowners pushed back in negotiations, which caused construction to be delayed.  In essence, the cost limitation was waived for the precise reason it should not be: because property owners questioned the exercise of eminent domain.  The waiver sets a troubling precedent that punishes property owners for attempting to rely on protections afforded them in an eminent domain process that the agency is supposed to oversee.

28

line capacity. And they point out that, if a landowner has a problem with a gas company's use of eminent domain, that person may file a complaint with FERC. But just as Columbia's claimed limitations are insufficient, so are those proposed by the Majority.

As for the primary-purpose requirement, because FERC does not review projects that are automatically authorized, 18 C.F.R. § 157.208(a), as Columbia says is so in this instance, there is no independent way to determine what the primary purpose of the replacement is. As for delivery points, they have nothing to do with the present dispute – they are not pipelines. As for capacity, I assume my colleagues are referring to the provision of that regulation which excludes from the definition of "eligible facility" "[r]eplacements for the primary purpose of creating additional main line capacity." 18 C.F.R. § 157.202(b)(2)(i). That regulation prohibits gas companies from undertaking a replacement for the primary purpose of increasing the gas capacity of the pipeline. Again, though, the regulation as interpreted by the Majority would permit a gas company to construct pipelines anywhere outside the original right-of-way and thus does not preserve constitutional protections for property owners. And, finally, as for the option landowners have of filing complaints with FERC, it is perverse to foist upon the citizenry the obligation of policing those whom the government, as agents of the citizenry, are already supposed to be policing.

To repeat, because the cost cap – the only legitimate control on Columbia's "automatic authorization" of its exercise of eminent domain – is waivable by FERC and thus proves to be an unreliable restraint, the Majority's

29

interpretation of Part 157 is constitutionally suspect in that it permits a delegation of power beyond that which can properly be made to a private company. The District Court exaggerated only a little in saying that the interpretation proposed by Columbia and since adopted by the Majority means that a "certificate automatically authorizes relocation of replacement Line 1655 literally anywhere on earth, so long as the replacement 'will not satisfy the location or work space requirements of § 2.55(b).'" (App. at 32.) That outcome is untenable.

The Majority's ruling presents another constitutional problem. In *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915), the Supreme Court distinguished the concerns arising from agency actions that affect broad swaths of the population and those zeroing in on a handful of individuals, noting that the latter were more significant. It made clear that, when agency action affects "[a] relatively small number of persons," those individuals are "exceptionally affected." *Id.* at 446. Such action is adjudicative in nature, and property owners are entitled to procedural due process above and beyond that which has been provided by the legislature via the agency's organic statute. *Id.*

Consistent with that safeguard, Congress and FERC require significant oversight of any construction outside a FERC-issued certificate's right-of-way. Specifically, the Natural Gas Act provides, "[n]o natural-gas company … shall … undertake the construction or extension of any facilities therefor … unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or

30

operations." 15 U.S.C. § 717f(c)(1)(A). Thus, the requirements for obtaining a new certificate apply "in every case where a natural gas company acquires additional property, even for operation and maintenance purposes."[16]

---

[16] The Majority characterizes § 717f(c)(1)(A) as only being applicable to extensions of already-existing facilities. (Maj. Op. at 32 n.19.) But the statute is not so limited, as it applies to "any proposed *construction* or extension." 15 U.S.C. § 717f(c)(1)(A) (emphasis added). There is no dispute that the project constitutes a "construction"; in fact, FERC in its Footnote Rule aptly described replacements outside the original right-of-way as "construction of … main line facilities … without restriction on their location." *Revisions to Auxiliary Installations*, 78 Fed. Reg. at 72804 n.75. Columbia likewise refers to its replacement project as a construction, noting that "[i]f [it] is not able to begin construction on the properties by September 1, 2014, weather events could have a significant disruptive effect." (Appellant's Opening Br. at 8, 39.)

In any event, the distinction between an "extension" and "proposed construction" is meaningless in this case because the regulatory goal as to both is to place significant controls over a natural gas company acquiring additional property, no matter the reason. FERC has promulgated such controls for construction, expansion, or any other purpose requiring a FERC certificate, "to ensure that landowners will be informed of any proposed infringement of their property rights, and will have an opportunity to contest such proposed infringements, *prior* to condemnation proceedings." *Williston Basin Interstate Pipeline, Co. v. An Exclusive Gas Storage Leasehold*, 524 F.3d 1090, 1097 (9th Cir. 2008) (emphasis added) (citing 18 C.F.R. §§ 157.6(d)(2)(iv),

31

*Williston Basin Interstate Pipeline Co. v. Exclusive Gas Storage Leasehold*, 524 F.3d 1090, 1097 (9th Cir. 2008). A "key Congressional goal in enacting the NGA [was] to have FERC balance the competing public interests involved in a proposed project through the issuance of certificates of public convenience and necessity." *Id.*; *see* 15 U.S.C. § 717f(e) (setting forth factors for FERC to consider in deciding whether to issue a FERC certificate). Notably, FERC has interpreted that provision to require detailed notice to affected landowners of their rights as to the proposed project and a formal hearing where they have an opportunity to intervene and protest it. 18 C.F.R. §§ 157.6(d)(2), 157.10.

The Majority manages to turn those limiting regulations into a grant of limitless authority to natural gas companies for basically the same activity as long as that activity is labeled a "replacement." The approach adopted today allows a gas company to bypass all notice-and-hearing requirements by tying its proposed project to the originally authorized pipeline, even if that authorization was provided decades ago and in an entirely different location. No consideration is given to the rights of newly affected parties. That is fundamentally at odds with regulations requiring notice and an opportunity to participate in certificate hearings.

It is also at odds with what the Supreme Court has said about the searching review FERC is supposed to undertake before issuing a certificate:

---

157.6(d)(3)(v), 157.10 (procedures for obtaining a FERC certificate)).

32

[A] natural gas company must obtain from FERC a 'certificate of public convenience and necessity' before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce.  FERC will grant the certificate only if it finds the company able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme.

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 302 (1988) (citation omitted).  In short, the Supreme Court has read § 717f(h) of the Natural Gas Act to require gas companies to apply for a new certificate prior to engaging in construction projects like the one here, as the companies are subject to FERC's "statutory duty" to carefully review any new project that "constructs, extends, acquires, or operates any facility for the transportation" of natural gas.[17]  *Id.*

FERC, once upon a time, interpreted its regulations to require notice and hearings to protect affected landowners'

------

[17] In fact, Columbia concedes that it was free to petition FERC for another certificate of public convenience and necessity to authorize its current project, but it chose not to.  Had it done so, much delay and expense would have been avoided here.  But Columbia wants a precedent for the exercise of power.  That is unfortunate because, if everything is as Columbia claims, the pipeline construction would be underway and perhaps completed, the Landowners' rights would have been addressed, and safety issues, to the extent there are any, would have been resolved.

interests and balance them with the public interest in a safe and properly functioning supply of natural gas.[18] The Majority's reading of the regulations, while very convenient for Columbia and perhaps the public at large, leaves those procedural, even constitutional, protections for property owners in tatters.[19]

---

[18] The Majority implies that I am standing in the way of safety measures. That is not my position. I am certainly not suggesting that pipes be left to rot in the ground. A gas company can maintain or replace its pipeline on or adjacent to its certificate's designated right-of-way, but if it strays beyond that, the regulations and the Constitution bring procedural protections into play that require a utility to approach FERC for a new certificate. Notice and an opportunity to be heard are basic protections for the property rights of American citizens.

[19] The Majority also errs in reversing the District Court's denial of Columbia's request for a preliminary injunction and immediate possession of the easements. Because I believe Columbia lacked the authority to condemn the easements by the power of eminent domain, as discussed above, I would also conclude that Columbia does not have a right to immediate possession of the easements. But even assuming Columbia's success in this case, the speculative nature of Columbia's proffered evidence cuts against an injunction. The testimony of Doug Holley, a former employee and current easement-contract negotiator, is persuasive. At the preliminary-injunction hearing below, he conceded that he "do[es not] know as an individual [whether the line could fail soon] because [he] ha[s] not seen the line, [he] ha[s] done no testing on the line, [and he] can't speak to whether there is an immediate danger. [He is just] assuming

### III. Conclusion

Because the Emergency Reconstruction Notice provides an interpretation that is not plainly erroneous and that reflects a fair and considered judgment concerning limits on where a replacement pipeline may be located, we should give that interpretation deference. The District Court did not err in understanding that such a limitation is necessary, nor in determining that a significant departure from the pipeline's original route exceeds that limit. Thus, applying basic administrative-law principles leads to the conclusion that we should be affirming the ruling of the District Court. Speaking more generally, it is disturbing and discouraging that, by today's ruling, the Majority endorses a view of delegated sovereign power so broad that a private gas company, with no agency oversight or other significant procedural restraint, can take the property of other citizens far removed from that company's original right-of-way. I therefore respectfully dissent.

---

there is because [his] company has put into place this prioritization system [to determine which line to replace next]." (Preliminary Injunction H'g Trans. at 53:19-24.) Columbia proffers no evidence indicating that a threat is imminent. Therefore, based only on the information before us, a preliminary injunction is not the proper remedy here.